UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DERRICK DESHAWN MILLER,
DARREN WALLACE CHAPPELL, and
STACEY SIMEON HALL,

                        Plaintiffs,                     Civil Action No. 15-12500
                                                         Honorable Marianne O. Battani
                                                         Magistrate Judge David R. Grand

v.

HANWHA L&C MONROE PLANT, *et al.*,

                        Defendants.

_____/

## REPORT AND RECOMMENDATION TO GRANT DEFENDANTS HANWHA AND DERON'S MOTIONS FOR SUMMARY JUDGMENT [31, 32]

      This is an employment discrimination case brought pursuant to Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000 *et seq.*) and 42 U.S.C. § 1981 by *pro se* Plaintiffs Derrick Deshawn Miller, Darren Wallace Chappell, and Stacey Simeon Hall[1] against Defendants Hanwha L&C Monroe Plant ("Hanwha"), Cathy Garello-Deron ("Deron"), Chang-Bum Kim, Sang Mook Lee, Dennis Kirkland, and the Equal Opportunity Commission and four of its

---

[1] Plaintiffs Miller, Chappell, and Hall filed separate actions. On July 14, 2015, Plaintiff Miller filed a complaint in this Court (Doc. #1), although in the complaint, he references a "related case" in the Circuit Court for the County of Monroe, in the State of Michigan, Case Number 15-137917-cz, before Judge Daniel S. White. (*Id.* at 10-11). On November 4, 2015, Plaintiff Miller filed an amended complaint, adding Cathy Garello-Deron as the Defendant who will replace the Defendant previously identified as "Unknown Human Resources" and "Unknown Secretary." (Doc. #11 at 1). Plaintiffs Chappell and Hall filed their complaints in the Circuit Court for the County of Monroe, in the State of Michigan. (Case No. 15-12591, Doc. #1; Case No. 15-14272, Doc. #1). Defendants filed Notices of Removal – on July 23, 2015 in Plaintiff Hall's case and on December 7, 2015 in Plaintiff Chappell's case – removing these cases to this Court. (*Id.*).

On March 30, 2016, these three cases were consolidated under lead case number 15-12500 by District Judge Marianne O. Battani's Order Granting Plaintiff Miller's Motion to Consolidate and Dismissing Plaintiff Chappell's and Hall's Motions to Consolidate as Moot. (Doc. #24).

employees.[2]  Plaintiffs Miller, Chappell, and Hall allege that Defendants failed to employ them because of race discrimination.  An Order of Reference was entered by District Judge Marianne O. Battani on November 10, 2015, referring all pretrial matters to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B).  (Doc. #13).

Presently before the Court are Defendants Hanwha and Deron's Motions for Summary Judgment as to the claims brought by Plaintiffs Miller and Hall.[3]  (Docs. #31, 32).  The Court finds that the facts and legal issues are adequately presented in the docket filings, and it declines to order a hearing at this time.  (Doc. #37).

## I.      RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Defendants Hanwha and Deron's Motions for Summary Judgment **(Docs. #31, 32)** be **GRANTED**.

## II.     REPORT

### A.      Factual Background

In their practically identical complaints, Miller and Hall allege that "on or about" January 22, 2014, they applied for a "laborer position" at Hanwha.  (Doc. #1 at 5; Doc. #11 at 3; Case No. 15-12591, Doc. #1 at 9).  They contend that every two weeks, they followed up with the

---

[2] On July 28, 2015, a Stipulation and Order of Dismissal with Prejudice as to Defendants Gail Cober, Arlene McFadden, Lolita Davis, Beverly Clark and the United States Equal Employment Opportunity Commission was entered in Plaintiff Hall's case (before the cases were consolidated).  (Case No. 15-12591, Doc. #4).  On January 26, 2016, because Defendants Chang-Bum Kim, Sang Mook Lee, and Dennis Kirkland had never been properly served, they were dismissed from the action.  (Case No. 15-12591, Doc. #12).

On February 10, 2016, a Stipulation and Order of Dismissal with Prejudice as to Defendants Gail Cober, Arlene McFadden, Lolita Davis, Beverly Clark and the United States Equal Employment Opportunity Commission was entered in Plaintiff Miller's case (before the cases were consolidated).  (Doc. #22).

[3] Plaintiff Chappell's claims are still in the discovery stage and are not part of the instant motions.  (Doc. #40).

secretary "regarding the status of [their] application[s] (resume)." (*Id.*). Despite allegedly being "informed that the company was hiring individuals for the 1st and 2nd shift and [they] will receive a call about the status of [their] resume[s]," Miller and Hall "never heard anything." (*Id.*). A few weeks later, they both say they called and were "told that [Hanwha] was not hiring at this time." (*Id.*). Miller and Hall allege that "[t]his is totally untrue" because a friend of a friend of theirs, who is Caucasian, applied for a position at Hanwha and "was immediately hired." (*Id.*).

Miller and Hall believe they were "denied hiring due to [their] race (African American)." (Doc. #1 at 5; Doc. #11 at 4; Case No. 15-12591, Doc. #1 at 9). They allege that Defendants "failed to recruit" and "failed to hire" African American applicants "for entry-level (non-skilled) positions" in "clear violation of Title VII" (42 U.S.C. § 2000 *et seq.*) and 42 U.S.C. § 1981.

1.   <u>Plaintiff Miller</u>

*a.  Miller Submitted His Resume to Hanwha*

Miller testified that on January 22, 2014, he applied to work at Hanwha by submitting a resume to Deron, a human resources officer, in person. (Doc. #32-3, "Miller Dep." at 34, 55, 60, 74[4]). Miller's uncle had told him about Hanwha, a new company that was opening locally and was "probably hiring." (*Id.* at 50-51, 55). When Miller was on his way to Hanwha with his resume, he ran into Hall, who offered him a ride "because he was going over there too to see if they was [sic] hiring." (*Id.* at 56-57).

They parked in front of Hanwha and walked in together. (*Id.*). In the lobby, there was a window that went into an office, where Deron was sitting at a desk. (*Id.* at 57-58, 63). After she said "Good morning," Miller and Hall both asked her, "Are you all doing any hiring around this time?" (*Id.* at 58-59). Miller recounts that she said, "We are hiring for the first shift." (*Id.* at

---

[4] The Court will reference Doc. #32-3 as "Miller Dep. at xx."

59).  He and Hall gave Deron their resumes, and she said "You know, when we start doing the hiring, then we will start calling people for the first shift."  (*Id.*).  Miller can't remember if she said anything else.  (*Id.* at 60).

Miller's second interaction with Hanwha was also in person, about four weeks later.  (*Id.* at 61, 73).  In February 2014, Miller returned to Hanwha with Hall, who "initiated that visit."  (*Id.* at 61, 75).  Back in the Hanwha lobby, they both spoke to Deron again.  (*Id.* at 62).  Miller, who brought another copy of his resume, asked, "Are you all still doing any more hiring at this time?"  (*Id.*).  Deron allegedly responded that Hanwha had filled its first shift but said that "the second shift is going to be opened up, and once it's open I'm going to give you a call."  (*Id.*).  Miller then was asked whether Deron "personally said she was going to be giving [him] a call."  Miller said, "Yes."[5]  (*Id.* at 63).  Miller believes he had no other communications with Hanwha regarding them hiring him.  (*Id.* at 78).

### b.  Miller's Resume/Employment History

The resume Miller submitted to Hanwha lists his employment history from September 2010 through October 2013.  (Doc. #32-5 at 2).  According to his resume and deposition testimony, he has not worked since October 2013.[6]  (Miller Dep. at 39; Doc. #32-5 at 2).  Miller's most recent job on his resume was at Impact Employment Solutions ("Impact") in Monroe, Michigan, where he worked for about two and a half weeks, starting on September 18,

---

[5] On the second day of Miller's deposition, he retold this differently; he said Deron answered the question about whether they were doing any hiring with a simple "No."  (Miller Dep. at 76).  Miller did not recall anything else happening beyond this and could not recall the date in which it took place. (*Id.* at 76-77).

[6] At the same time, during his deposition, Miller acknowledged that since applying to work at Hanwha in January 2014, he worked at Howard Temes in Monroe, Michigan in July and August of 2014.  (Miller Dep. at 34-35).  But he testified that he "didn't last there long" because he "was doing temporary service through a month."  (*Id.*).

2013.  (Miller Dep. at 38; Doc. #32-5 at 2).  At this job, he packaged food and stacked boxes, for which he was paid $7.40/hour.  (Miller Dep. at 35; Doc. #32-5 at 2).  He "got that job through Phoenix Temp[orary] Service" ("Phoenix"), so he was technically employed by Phoenix.  (Miller Dep. at 36).  Prior to his job at Impact, Miller worked at Backyard Products in Monroe, Michigan, for seven days – from June 6, 2013 to June 12, 2013.  (Miller Dep. at 41-42; Doc. #32-5 at 2).  Phoenix also assigned him to this job, where he carried out packing duties and was paid $9.25/hour.  (Miller Dep. at 40-41; Doc. #32-5 at 2).  Six months earlier, Miller held a two-week (January 8, 2013 – January 18, 2013) job at Bektrom Foods, Inc. in Monroe, Michigan, packaging food and stocking boxes for $7.40/hour.  (Miller Dep. at 42-43; Doc. #32-5 at 2).

The year before, in September 2012, Miller worked at Pioneer Metal Finishing in Monroe, Michigan, loading and unloading racks from an assembly line.  (Miller Dep. at 43-44; Doc. #32-5 at 2).  He earned $8.50/hour and obtained this job through Phoenix.  (Miller Dep. at 44).  However, Miller worked there "only one day," "from September 5th to September 6th."  At his deposition, he was unable to explain the short duration of this job.  (*Id.*).

Prior to that, for one week in July 2012 (Miller could not recall the specific dates), Miller packaged car parts for $7.40/hour at Howard Ternes.  (Miller Dep. at 45; Doc. #32-5 at 2).

Miller's earliest employment was between September 2010 and November 2010, when he did stocking and customer service at Halloween City in Monroe, Michigan.  (Miller Dep. at 46-47; Doc. #32-5 at 2).

When Miller submitted his resume to Hanwha, these were all of the employment experiences he had ever had.  (Miller Dep. at 46).  During his deposition, he admitted that his resume does not reflect any "positions that involve [him] directing other employees in the position of a supervisor or a leader"; "promotions"; "positions where [he was] actually running

5

machinery"; or "personal references or names of former bosses from any of [his] past places of employment." (*Id.* at 48-49, 52). Furthermore, he said that as of January 22, 2014, he did not know anyone who worked at Hanwha, so "there was nobody inside Hanwha who was in a position to recommend [him] for employment there." (*Id.* at 49).

### c.   *Miller's Allegations/Understanding of the Hiring Process*

Miller testified that "the purpose of a resume is to tell a potential employer what there is about you and your experience that would cause them to select you for employment." (*Id.* at 49-50). He was aware "that other people were preparing resumes and submitting them to Hanwha as well," and that "typically most companies have more applicants than they have available jobs." (*Id.* at 50-51). But regarding the steps a company like Hanwha takes after a resume is submitted, Miller said, "I don't know." (*Id.* at 51). He agreed that he can expect them to read the resume, but he was unaware what the person reading the resume at Hanwha would be looking for. (*Id.*). When asked what he thinks would prompt someone at Hanwha to select him for a job interview, Miller responded, "I would say I probably would have been a good fit for the job or whatever" (where a "good fit" means having relevant experience). (*Id.* at 52-53). Although Miller said "I don't know" when asked if he understands "that employers value employees who demonstrate that they can hold a job by remaining employed for a length of time," he agreed that his resume "would suggest to anybody" who read it that "for some reason … except for the Halloween City job, which was approximately 90 days, … whenever [he] get[s] placed in the job it appears to end either that month or the next." (*Id.* at 53).

Miller alleges that he is "personally familiar with … African American employees of Hanwha." (*Id.* at 80). He listed the names of five individuals, although he could not remember if they worked for Hanwha or a temporary service, like Phoenix. (*Id.* at 80-82). He had not

6

looked into Hanwha's work force, and other than the individuals he named, he was not aware whether Hanwha employed African Americans whose names he did not know.  (*Id.* at 82). When asked if it was "fair to say that [he had] never actually known how many African-American employees Hanwha has," Miller responded, "At this time I don't know."  (*Id.*).  As a follow up to this, Miller was asked, "You have never known, have you?"  (*Id.* at 83).  Miller responded, "No."  (*Id.*).  Other than Hall (who submitted his resume with Miller), "[n]obody told [Miller]" that they applied, but Hall had told him that many people applied.  (*Id.* at 83-84).

At his deposition, Miller answered affirmatively when asked if he had identified a resume of an individual hired by Hanwha that he felt reflected qualifications inferior to his, so that he felt he should have been hired in their place.  (*Id.* at 84).  But when asked to specify, he said, "I can't remember at this time."  (*Id.*).  Following this, he mentioned Kyle Buckley's resume – but Kyle Buckley was employed by a temporary service (and not Hanwha).  (*Id.* at 85).  Then, he mentioned Corey Metdepenningen's resume (Doc. #31-8), and the following testimony ensued:

> Q:  What is it about this resume that you feel states qualifications inferior to yours? …
>
> A:  [T]he way I am looking at things here, his resume is more stronger than mine, and that's how he got the job over there and I didn't.
>
> Q:  You are saying that Mr. [Metdepenningen's] resume is stronger than yours?
>
> A:  Yes, it is.
>
> Q:  And you acknowledge that that is the reason he got the job over there? Is that what you just said?
>
> A:  Not only that.
>
> Q:  Are you acknowledging that, that he got the job at Hanwha because his resume is stronger than yours?
>
> A:  Yes.

7

Q:  So what facts are you basing your contention upon that Hanwha engaged in race discrimination by not selecting your resume for an interview and eventual hire?  What facts are you relying upon?

A:  Well, I'm relying on that my resume wasn't strong enough for the job. That is one of the reasons, and not only that, I didn't get a call for an interview or none of that, because of the skin of my color [sic] right here.

Q:  I believe what you just said is that you believe race discrimination has occurred because your resume wasn't strong enough and you feel that you didn't get a call because of the color of your skin.  Correct?

A:  Yes.

Q:  Are there any other facts upon which you are relying in your contention that you were discriminated against on the basis of your race? …

A:  Other than that, that's all I know.

Q:  And so, Mr. Miller, if Hanwha were to state that your resume wasn't selected and you were not one of the candidates selected for follow-up interview and hire because your resume indicated that four out of your five most recent jobs ended within 30 days, that the fifth of your five most recent jobs ended within 60 days, and that all of the jobs on your resume ended within 90 days, that other people appeared to be better candidates than you, are you aware of any facts that would suggest that to be a false reason?

A:  That could be a reason why.

(Miller Dep. at 86-88).

2.    Plaintiff Hall

a.  Hall Submitted His Resume to Hanwha

Hall testified that he recalls first hearing about Hanwha's job posting while he was at the Arthur Leslow Community Center.  (Doc. #31-3, "Hall Dep." at 72[7]).  Months before he submitted his resume to Hanwha in January 2014, he and Miller were talking about jobs available at Hanwha and "about other jobs too."  (*Id.* at 77).  At this point, they did not plan on preparing resumes and submitting them to Hanwha at the same time.  (*Id.* at 76).  Hall prepared

---

[7] The Court will reference Doc. #31-3 as "Hall Dep. at xx."

8

the resume he submitted to Hanwha "because the job requested a resume." (*Id.* at 10, 22, 39). He saw this request on a door at Hanwha and saw a listing for the job somewhere else he could not remember. (*Id.* at 11-12). But he knew Hanwha "was a new factory in the neighborhood," and "they were taking resumes," and Hall and some other guys "were just trying to gain employment opportunities over there." (*Id.*).

He and Miller applied at the same time because Miller "said he had a resume," and they "rode over there" in Hall's truck. (*Id.* at 80). When they arrived at Hanwha on January 22, 2014, Hall said he "went to the wrong door," so then he "went to the window." (*Id.* at 80-81). Deron walked up to that window, and "was friendly." (*Id.* at 80). According to Hall, they had "a friendly conversation," where he told her he was looking for a job and lived five minutes away and "really need[ed] a job opportunity." (*Id.* at 81). He and Miller left their resumes, and Deron said Hanwha was "hiring for first shift." (*Id.* at 81-82).

About two or three weeks later, Hall returned to Hanwha with Miller to bring Deron "some court papers"[8] because he "didn't want [his] criminal history to affect an employment opportunity." (*Id.* at 83-84). When he gave them to Deron, he said that "someone made a mistake," so if something shows up on his criminal history, "this could prove that it didn't happen." (*Id.*).

The third time Hall went to Hanwha, he was informed that Hanwha had completed its first shift hiring and that it was "going to be starting a second shift." (*Id.* at 85). He asked to be considered: "I was literally begging for the job, and I still want the job, I do, I do to this day." (*Id.*). Other than reiterating that he "need[ed] a chance," Hall did not remember anything else about the conversation, including anything Deron might have said. (*Id.*).

---

[8] Later in his deposition, Hall said he could have brought Deron the papers "the second or the third or the fourth or the fifth time" he was at Hanwha. (Hall Dep. at 84).

The fourth time Hall went to Hanwha, he remembers "having hope in the conversation that [he] was going to get called for the second shift." (*Id.* at 86). But, according to Hall, "it didn't pan out my way." (*Id.*). It was either on his fifth or sixth visit to Hanwha that he was advised that Hanwha "had filled all the positions for [the] second shift, and [he] didn't get hired." (*Id.*). Hall recalls being told that "if somebody doesn't work out, we might call you" – but "that never happened." (*Id.*). Later on, his brother, Yves Hall, saw Deron at a job fair. (*Id.* at 90). This surprised Hall because he believed Deron "wouldn't be at a job fair if [Hanwha wasn't] hiring." (*Id.*).

Hall kept going "back and back and back" to Hanwha because he "really wanted a job." (*Id.* at 83). He testified that he "might have visited ten times because [he] was bothering them regularly, and [he] called a lot." (*Id.* at 86). When asked if anyone from Hanwha ever used racial epithets to him he said, "No …. They were very kind." (*Id.* at 105).

### b. Hall's Resume/Employment History

The resume Hall provided to Hanwha indicates that, from August 15, 2008 through the present, he has been an Art Instructor at Arthur Leslow Community Center in Monroe, Michigan.[9] (Doc. #31-5 at 2). During his deposition, he clarified that at one point, he was "on payroll" at the Community Center, "but that was years ago." (Hall Dep. at 21-22). Now he is just "doing something to stay busy and volunteer[]." (*Id.* at 22). When he was "employed" there, he estimated that he worked only "two hours a week … teaching art classes to some

---

[9] Although not listed on the resume he submitted to Hanwha, Hall testified that he worked at Backyard Products in 2014 or 2015 (he was "not exactly sure of the dates"). (Hall Dep. at 23). He said it was not on his resume because when he submitted it to Deron, he "did not have the job at Backyard [Products]." (*Id.* at 39). Still, he guessed that he worked there full-time "somewhere around ten or eleven months." (*Id.* at 23). Hall also mentioned that, years ago, he had a hi-lo certification at an old job (he doesn't remember what job it was or when he had this job). (*Id.* at 36). This certification does not appear on his resume, either, and he has no documentation of it. (*Id.*).

children" for about $10.00/hour.  (*Id.*).

From January 23, 2013 through February 13, 2013, Hall was a general laborer at Malone Staffing.  (Doc. #31-5 at 2).  He testified that he forgot to include that when he was working with Malone Staffing, he was also working with Kelly Services; both agencies assigned him to work at the same job site for Johnson Controls.  (Hall Dep. at 36-37).  He believes he was paid $11.00/hour.  (*Id.* at 48).  When shown a document from Malone Staffing that indicated that he was "Terminated/Fired/Was walked out due to his behavior on 02/13/13," Hall testified that a hi-lo driver accused Hall of calling him a name; Hall denied it, but said, "If you don't want me here, I'll just go," so they walked him out.[10]  (*Id.* at 49).

Almost ten years earlier, from January 5, 2004 through November 4, 2004, Hall was a cook at Wendy's.[11]  (Doc. #31-5 at 2).  He could not recall his employment prior to this timeframe.  (Hall Dep. at 55).

Hall agreed that his resume includes no supervisory or leadership positions "that involved [him] directing … employees"; no "promotions"; and no "personal references from past employers … willing to vouch for [his] work ethic."  (*Id.* at 55-57).  Although his Malone Staffing position was in a manufacturing environment, his resume "did not point out that it was." (*Id.* at 56).  Furthermore, Hall admitted that he does not know "anybody already working at Hanwha who could vouch for [him], [his] work ethic, [and] his character."  (*Id.* at 57).  He

---

[10] Hall also worked at Kelly Services from November 1, 2011 through March 1, 2012.  (Hall Dep. at 50).  He said he did not include this on the resume he gave to Hanwha because he "forgot the dates" and "forgot to put it on there" because he "just wanted to get something in to them." (*Id.* at 54).  Although allegedly not a reason why he left it off his resume, Hall did say that he "knew [he] would have got[ten] a bad reference [from Kelly Services]."  (*Id.*).

[11] Hall's employment at Wendy's ended when he was incarcerated after pleading guilty to malicious destruction of property.  (Hall Dep. at 46, 60).  He spent four years in prison and was released in 2008 or 2009.  (*Id.* at 46-47).  When he got out of prison, "[i]t was hard getting a job," and Hall thinks he was not employed in 2010 and 2011.  (*Id.* at 47).

testified that his criminal history – which in addition to the 2004 malicious destruction of property conviction, includes a 1992 "charge of malicious destruction of fire or police property with a habitual offender fourth offense," and a 2001 conviction for "attempted resisting and obstructing a police officer" – has "some serious mistakes" because in 2003 or 2004 certain misdemeanors were changed to felony status "without due process," and he "was convicted of felony status under a wrong code." (*Id.* at 58, 60-63).

### c.  Hall's Allegations/Understanding of the Hiring Process

Hall testified that the purpose of a resume "is to give a view of what the person is capable of doing …. [T]o let them know that you can work, and you have some work history." (*Id.* at 72).  He is aware that "typically, more people apply than jobs are available," and that in this case, "other people interested in working for Hanwha were also preparing resumes." (*Id.*).  He admitted that he does not know at what point in the hiring process Hanwha has individuals fill out an application, but he understands that someone reviews resumes and picks candidates, and after that, an interview would occur. (*Id.* at 72-74).  As for reference checks, Hall said, "I mean if that's what they do, that's what they do.  I don't know what they did." (*Id.* at 73).

When Hall was asked what about his resume he thinks would prompt Hanwha to select him as a candidate for employment, as opposed to others who applied, he answered:  "I don't know.  I mean I can't answer that for someone else looking at it.  Actually, in my opinion, give somebody a chance.  If they live close to the factory, give them the opportunity." (*Id.* at 74).  Hall then said he should have labeled his work with Kelly Services "a little bit better on [his] resume.  Because I reviewed the papers you sent me with the other resumes, and I [saw] how elaborate theirs [were], and mine is just a basic resume." (*Id.*).  Ultimately, "all [he] wanted" was "an unskilled job" and "an opportunity to have a job." (*Id.*).

After reviewing Cory Metdepenningen's resume, which indicates that he had continuous employment from 2007 through 2014 (Doc. #31-8), Hall said that what would have made him a better candidate than Metdepenningen was that he "live[s] closer" to Hanwha. (Hall Dep. at 89-90). Hall was asked if he had identified any other Hanwha employee that he feels has better qualifications than him, and he responded: "I don't know. I haven't looked through all the paperwork. I didn't look through all their history. If they've got history, they've got history. I'm just trying to get an opportunity." (*Id.* at 90).

At the time of his deposition, Hall did not know how many people Hanwha hired in an hourly capacity. (*Id.* at 87). Nor did he know how many African American employees were employed in an hourly position at Hanwha.[12] (*Id.*). Still, he acknowledged that Derek Miller, Jr.,[13] his cousin, and an African American, received an offer to work at Hanwha. (*Id.* at 93). While Hall listed the names of a number of other Hanwha applicants on his witness list, he was unable to testify as to any of the details of their applications and/or Hanwha's hiring decisions. (*Id.* at 95, 100-02).

Although Hall has applied for jobs elsewhere, he has not accused other prospective employers of denying him employment because of his race. (*Id.* at 104). At his deposition, Hall explained that he filed a complaint against Hanwha

> because, for one, I felt that a large number of African Americans in the community were denied an opportunity, and it kind of baffled me. Some of the people had good work histories. I'm not going to say that my work history is exemplary, but the others, Manuel Mendez, his resume and his work history is good. Larry Aaron, his work history is good. Ab

---

[12] Despite saying he did not know these numbers, later in his deposition Hall asserted that Hanwha hired seventy people, but he "can't remember" who said that to him. (Hall Dep. at 87-88). He also testified that Lolita Davis, from the EEOC, told him that Hanwha hired two African Americans. (*Id.*).

[13] Hanwha and Deron clarify that this is how Hall's cousin's name is spelled. (Doc. #31 at 20).

> Montague, his work history is good.  He had military status behind him.
> Some of the other applicants, they had good work history, and I just
> couldn't understand it, and I said, well, just keep going and try to get a job
> there.  I explained that to the lady at the EEOC I just want a job.

(*Id.* at 105).  Hall was then asked:

> If Hanwha were to say that you weren't granted an interview because your
> resume listed only sporadic employment from 2004, Wendy's in 2004,
> Malone for three weeks in 2013 and an art instructor job which is not
> terribly relevant to their operation and which may have been irregular
> employment and which you now actually say was just volunteer work, and
> that they had other candidates that were better suited for employment or
> better known to them than you, are you aware of any facts that would
> suggest that those were false reasons?

(*Id.* at 106).  Hall simply responded:  "If that's the reason, that's their reason."  (*Id.*).

### B.    Defendants Hanwha and Deron's Motions for Summary Judgment

In their motions for summary judgment, Hanwha and Deron argue that they are entitled
to summary judgment because there is no question of fact that their "failure to advance [Miller
and Hall's] resume[s] to the interview stage – with the result that [they] were not hired – was not
due to race discrimination."  (Doc. #31 at 20; Doc. #32 at 11).  Specifically, Hanwha and Deron
argue that Miller and Hall "cannot establish a prima facie case" of race discrimination (Doc. #31
at 20-23; Doc. #32 at 17-20), and they cannot show that Hanwha and Deron's reason for
bypassing their resumes and not hiring them is pretextual.  (Doc. #31 at 23; Doc. #32 at 20-21).

### C.    Standard of Review

Federal Rule of Civil Procedure 56 provides:  "The Court shall grant summary judgment
if the movant shows that there is no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga
Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if
it might affect the outcome of the case under governing law.  *See Anderson v. Liberty Lobby,*

14

*Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party.  *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion."  *Alexander*, 576 F.3d at 558 (quoting *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989)).

## D.   Analysis

Reading their complaints generously, Miller and Hall allege that Hanwha and Deron's failure to hire them violated Title VII (42 U.S.C. § 2000 *et seq.*) and 42 U.S.C. § 1981.  Title VII of the Civil Rights Act of 1964 "tolerates no racial discrimination, subtle or otherwise."  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973) (holding modified by *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993)).  It was enacted "to assure equality of employment opportunities by eliminating those practices and devices that discriminate on the basis of race,

15

color, religion, sex, or national origin," *Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 457-58 (1975) (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974)), and that "have fostered racially stratified job environments to the disadvantage of minority citizens." *McDonnell Douglas Corp.*, 411 U.S. at 800.  In particular, § 2000e-2 "generally prohibits racial discrimination in any employment decision."  *Id.* at 796.  Title VII "creates statutory rights against invidious discrimination in employment and establishes a comprehensive scheme for the vindication of those rights."  *Johnson*, 421 U.S. at 457-58.  "In relevant part, § 1981 states '[a]ll persons ... shall have the same right ... to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.'"  *Aquino v. Honda of Am., Inc.*, 158 F. App'x 667, 673-74 (6th Cir. 2005).

The Sixth Circuit has noted that "[t]he elements of [a] *prima facie* case as well as the allocations of the burden of proof are the same for employment claims stemming from Title VII and § 1981."  *Id.* at 673-74 (citing *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir.2004) (citations and internal quotation marks omitted)).   A plaintiff may establish a discrimination claim "either by introducing direct evidence of discrimination, or by proving circumstantial evidence which would support an inference of discrimination."  *Id.* (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000) (citation omitted)).  Where a plaintiff is relying on circumstantial evidence, the Sixth Circuit

> has long adopted the *McDonnell Douglas* rule that a plaintiff may establish a *prima facie* case of discrimination by showing:  (1) he is a member of a protected class; (2) he was qualified for his job and performed it satisfactorily; (3) despite his qualifications and performance, he suffered an adverse employment action; and (4) he was replaced by a person outside the protected class *or* was treated less favorably than a similarly situated individual outside his class.

*Id.* (citing *Johnson*, 215 F.3d at 572-73; *McDonnell Douglas Corp.*, 411 U.S. at 802-03). "The facts necessarily will vary in Title VII cases," so the *prima facie* proof a plaintiff must show "is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas Corp.*, 411 U.S. at 802 n.13. Therefore, in a failure to hire case, the plaintiff carries the burden of showing:

> (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Id.*

If the plaintiff satisfies this *prima facie* test, the burden shifts to the defendant, who must "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Aquino*, 158 F. App'x at 674-75 (citing *Johnson*, 215 F.3d at 573); *McDonnell Douglas Corp.*, 411 U.S. at 802. If the defendant carries this burden, the burden shifts back to the plaintiff, who "must introduce sufficient evidence to create a genuine issue of material fact that the proffered reason was merely a pretext to hide unlawful discriminatory motives." *Aquino*, 158 F. App'x at 674-75. The plaintiff does this "by showing that (1) the stated reasons had no basis in fact, (2) the stated reasons were not the actual reasons, or (3) the stated reasons were insufficient to explain the defendant's actions." *Id.* at 675. It is not sufficient for the plaintiff "to disprove the employer's asserted reason; rather the plaintiff must prove by a preponderance of the evidence that the employer's decision *was in reality racially premised*." *Thomas v. Hoyt, Brumm & Link, Inc.*, 910 F. Supp. 1280, 1286 (E.D. Mich. 1994) (emphasis in original) (internal citation omitted).

Even when a plaintiff makes a *prima facie* showing of racial discrimination under the *McDonnell Douglas* "burden-shifting framework," "the plaintiff must ultimately prove that [he]

was a victim of intentional discrimination." *Macdonald-Bass v. JE Johnson Contracting, Inc.*, No. 09-11445-BC, 2010 WL 2990100, at *7 (E.D. Mich. July 28, 2010) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000)). "Accordingly, in the summary judgment context, 'a plaintiff must produce enough evidence that a jury could reasonably reject the employer's explanation for its decisions." *Id.* (citing *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996) (internal citation omitted)).

       1.   <u>Miller and Hall Have Not Shown a *Prima Facie* Case of Racial</u>
            <u>Discrimination in the Failure to Hire Context</u>

As Miller and Hall have not provided direct evidence of racial discrimination, the Court will use the *McDonnell Douglas* framework to analyze their proffered circumstantial evidence.

       *a.   Miller and Hall Have Not Shown that They Were Qualified for the Job for which Hanwha Was Hiring*

Miller and Hall have not demonstrated the second element in establishing a *prima facie* case of racial discrimination in the failure to hire context: that they applied and were qualified for the job for which Hanwha was seeking applicants. Although on January 22, 2014, they both gave Deron their resumes to apply for an unskilled job at Hanwha, there is no evidence in the record that they were qualified for the job they applied for.

In 2014, Hanwha considered applicants to be qualified if they "showed stability and steady employment of significant duration (longevity) … especially when their work ethic and habits had been observed or become known to others at Hanwha." (Doc. #31-2, Deron Decl. at 5, ¶ 14; Doc. #32-2, Deron Decl. at 5, ¶ 14[14]). Successful candidates for hourly positions at Hanwha "provided resumes reflecting a consistent effort to become and remain employed (or self-employed)." (Doc. #31-2 at 7, ¶ 20; Doc. #32-2 at 6, ¶ 17). One of Deron's "first

---

[14] The Court will reference Deron's Declarations as "Doc. #31-2 at xx, ¶ xx" and "Doc. #32-2 at xx, ¶ xx."

significant responsibilities" after she was hired for a human resources position in October 2013[15] was "the evaluation and hiring of employees for hourly positions." (Doc. #31-2 at 2-3, 5, ¶¶ 1, 12; Doc. #32-2 at 2-3, 5, ¶¶ 1, 12). According to Deron, during the relevant time period, "Hanwha filled twenty-three hourly positions at the … Monroe facility: two through transfers and 21 through new hires." (Doc. #31-2 at 4, ¶ 9; Doc. #32-2 at 4, ¶ 9). Two of the newly-hired positions – maintenance technician and quality technician – required "highly specialized experience," and the other nineteen positions "were more sophisticated than people might assume."[16] (Doc. #31-2 at 4-5, ¶¶ 10-11; Doc. #32-2 at 4-5, ¶¶ 10-11). Due to the start-up nature of the facility, Hanwha had to be very "careful with respect to hiring decisions" because of "reasonably complex duties and flexibility of assignments" and because of "the company's investment in training, including training imparted by engineers on site from Korea for the first months of the Monroe operation." (Doc. #31-2 at 5, ¶ 13; Doc. #32-2 at 5, ¶ 13). Thus, an "applicant's ability to consistently show up for work was important and valuable" because Hanwha "would have been significantly impaired by turnover and poor attendance." (Doc. #31-2 at 5, ¶ 13; Doc. #32-2 at 5, ¶ 13). Deron made an initial review of the resumes submitted to Hanwha "regarding whether each reflected the stability, longevity and experience that met Hanwha's needs." (Doc. #31-2 at 5-6, ¶ 15; Doc. #32-2 at 5-6, ¶ 15).

Deron found that "Miller's resume did not reflect stability, longevity or relevant

---

[15] Deron was hired shortly after Hanwha acquired a facility in Monroe, Michigan in 2013 for a start-up manufacturing operation. (Doc. #31-2 at 2-3, ¶ 1; Doc. #32-2 at 2-3, ¶ 1).

[16] Deron explains that "all of Hanwha's operator positions might be required to perform any of the jobs in the facility, including operating Hanwha's Bead Foam Reactor, where one person operates a large-scale operation." (Doc. #31-2 at 4-5, ¶ 11; Doc. #32-2 at 4-5, ¶ 11). Here, a single person is "regulating pressurization and molding characteristics in accordance with specifications, integrating computer data and controls with the physical operations required to produce a bead foam product and orienting to a production and shipping schedule." (*Id.*).

experience." (Doc. #32-2 at 6, ¶ 16). Deron points out that his "resume lists six jobs, four of which ended the same month in which he was hired; one of which ended the month after he was hired; and one which ended within 90 days." (*Id.*). Deron concluded that Miller losing all six of his jobs "in the same month, the next month, or the third month suggested unreliability." (*Id.*). Meanwhile, other candidates demonstrated an ability to hold a job for at least one year and therefore showed "better stability and longevity" than Miller. (*Id.* at ¶ 17). During his deposition, Miller testified about the employment history on his resume, which consisted of short-term or temporary jobs between 2010 and 2013. (Miller Dep. at 34-49, 52, 54-55; Doc. #32-5 at 2). At some of these jobs, he was replacing someone, so he knew he would only be working for one to two weeks. (Miller Dep. at 41-43). But at Pioneer Metal Finishing and at Howard Ternes, he was laid off sooner than he expected. (*Id.* at 45-46). Furthermore, he admitted that his resume does not reflect any supervisory or leadership positions, promotions, or experience running machinery. (*Id.* at 48-49, 52). Along those lines, he did not include references from previous places of employment or the name of someone within Hanwha who could recommend him for a job there. (*Id.* at 49).

Similarly, Deron found that Hall's resume "raised concerns about stability and longevity and did not reflect experience which appeared relevant or that met Hanwha's needs." (Doc. #31-2 at 6, ¶ 17). She also found that the long gap between his job at Wendy's in 2004 and his job at Malone Staffing in 2013, and his "unusual[ly] short assignment at Malone Staffing, "raised concerns about unreliability." (*Id.* at ¶ 16). Although Hall's resume says he has been an art instructor since 2008, this did not help bolster his qualifications because, in addition to it not being relevant work experience, Deron "surmised [it] was, at most, part-time or occasional employment." (*Id.*). Deron explains that "Hall engaged in other conduct that did not help his

20

cause," namely, she "found it unusual that Mr. Hall would call attention to his criminal history before Hanwha even expressed any interest in hiring him." (*Id.* at 6-7, ¶ 17). Given this "unusual behavior," in addition to the stability and longevity concerns raised by his resume, Deron "felt the plant manager and production manager would have questioned [her] judgment for scheduling an interview with Mr. Hall when Hanwha had so many other candidates." (*Id.* at 7, ¶ 19). According to Deron, "virtually all" of these other candidates "had one or more other attributes not reflected in Hall's resume, including but not limited to: [m]ilitary veteran status, high-level technical experience, prior responsible positions as a team leader, manager or supervisor, community college, certifications, computer skills or named references." (*Id.* at 7-8, ¶ 20). Like Miller, Hall agreed that his resume does not contain any leadership or supervisory positions, promotions, personal references, or recommendations from someone working at Hanwha. (Hall Dep. at 55-57).

The foregoing establishes that Miller and Hall failed to raise a material question of fact that they were qualified for the job they applied for at Hanwha.[17] They therefore cannot establish a *prima facie* claim of race discrimination.

Instead of presenting the evidence required to satisfy their burden, Miller and Hall's responses to Hanwha and Deron's motions for summary judgment merely allege that the Defendants "[have] and [are] still denying Plaintiffs and others on [the] 'Witness List' a job" (Doc. #33 at 2, ¶ 1; Doc. #34 at 2, ¶ 1) "because of 'race.'" (Doc. #33 at 4, ¶ 5; Doc. #34 at 4, ¶ 5). Miller and Hall base this allegation on the vague and conclusory contention that "White people would submit their resumes, and get hired," and "many other applicants 'African

---

[17] Hall's testimony that he should have been hired because he lives close to the facility does not raise a material question of fact because his physical proximity to Hanwha does not relate to a "qualification" for performing the required tasks of the job. (Hall Dep. at 74).

21

Americans,' would not be even considered or called."  (Doc. #33 at 2, ¶ 2; Doc. #34 at 2, ¶ 2). But Miller and Hall do not name the Caucasians who were hired (purportedly because they "don't want to see them get fired") (Doc. #1 at 6; Doc. #11 at 5; Case No. 15-12591, Doc. #1 at 10), and they do not provide a copy of their resumes, which would allow for a comparison of their qualifications.  "Where a plaintiff fails to establish that his qualifications were similar to the qualifications of non-protected class employees, summary judgment in favor of the defendant-employer is proper."  *Thomas v. Hoyt, Brumm & Link, Inc.*, 910 F. Supp. at 1287.  The law is clear that Miller and Hall "cannot create an issue of fact … by questioning the soundness of an employer's business decision," *Id.*, in this case, Hanwha's decision to hire individuals with qualifications it found Miller and Hall not to possess, such as stability, longevity, reliability, and relevant work experience.

> ### b.  *Miller and Hall Have Not Shown That, After They Were Rejected, Hanwha Continued to Seek Other Applicants with Their Qualifications*

Miller and Hall have also not established the fourth element of a *prima facie* case of race discrimination because they have not shown that, after they were rejected, Hanwha continued to seek other applicants with their qualifications.  Hanwha and Deron argue that to satisfy this element, Miller and Hall must establish that Hanwha "hired someone with similar qualifications" and that this is something Miller and Hall "cannot do."  (Doc. #31 at 22; Doc. #32 at 19). Hanwha and Deron point out that Deron "reviewed resumes for past employment experiences, qualifications, time between jobs and length of service on jobs" to pick candidates that demonstrated stability and longevity.  (Doc. #31 at 22; Doc. #32 at 19).  This was important to Hanwha, given its nature as a start-up operation.  (*Id.*).

As explained above, Miller and Hall have not shown that they possessed these qualifications.  Nor have they provided evidence that Hanwha sought out, or hired, applicants

with their qualifications.   Miller initially identified Metdepenningen as an applicant with "inferior" qualifications.  (Miller Dep. at 85).  But when he reviewed Metdepenningen's resume (Doc. #31-8), he admitted it was "stronger than [his], and that's how [Metdepenningen] got the job over there and [he] didn't."  (Miller Dep. at 86).  Ultimately, Miller admits that his "resume wasn't strong enough for the job," and this was one of the reasons he did not get an interview (the other purportedly being the color of his skin).  (*Id.* at 87).  Hall testified that the proximity of his home to Hanwha made him a better candidate than Metdepenningen, who had continuous employment from 2007 through 2014.  (Hall Dep. at 90).  But, as noted above, the location of an applicant's home has no bearing on his qualifications to perform a particular job's tasks. Moreover, Hall did not argue that Deron or Hanwha did not reasonably interpret his work history, and he did not identify any other Hanwha employee he believes has the same (or better or worse) qualifications than him.  (*Id.* at 90, 105).

For the reasons set forth above, Miller and Hall have not met their burden of establishing the elements of a *prima facie* racial discrimination case, and Hanwha's and Deron's summary judgment motions should be granted.

> 2.   Miller and Hall Have Not Shown that Hanwha's and Deron's Proffered Reason for Not Hiring Them was Merely a Pretext

Even if Miller and Hall could establish a *prima facie* case of racial discrimination, summary judgment would still be appropriate because they have not established that Hanwha and Deron's proffered reasons for not hiring them are pretextual.  As shown above, Hanwha and Deron proffered evidence that Miller and Hall were not hired because they lacked the necessary qualifications for the job, not because of their race.  The burden then shifted back to Miller and Hall "to prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination."  *Thomas v. Hoyt,*

*Brumm & Link, Inc.*, 910 F. Supp. at 1287-88 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  "To establish pretext, the plaintiff must show '*both*, that the reason was false, *and* that discrimination was the real reason.'"  *Id.* (emphasis in original) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)) ("[D]enial of reason is not enough to establish pretext.").  As laid out above, to prove pretext, the plaintiff must show that:  "(1) the stated reasons had no basis in fact, (2) the stated reasons were not the actual reasons, or (3) the stated reasons were insufficient to explain the defendant's actions."  *Aquino*, 158 F. App'x at 675.  Miller and Hall have not made this showing.

Hanwha and Deron point out that when Miller was asked if he was "aware of any facts that would suggest that Hanwha's reasons were false reasons, instead of adducing facts that would disprove the reason, he testified:  'That could be a reason why' he was not hired."  (Doc. #32 at 21) (citing Miller Dep. at 87-88).  When Hall was asked the same question, he simply testified:  "If that's the reason, that's their reason."  (Doc. #31 at 23) (citing Hall Dep. at 106).

Miller and Hall do not raise the issue of pretext in their responses to the motions for summary judgment.  Crucially, they have presented no evidence to raise a genuine issue of material fact that the reasons Hanwha and Deron have provided are false and/or that race played any part in Hanwha and Deron's hiring decision.  Instead, Miller and Hall's responses to Hanwha and Deron's motions for summary judgment consist primarily of statements *alleging* discrimination.  For instance, they argue that Deron denied Miller and Hall a job "on the basis of viewing [them] through [a] window," where she "racially identified [them] as 'African American'" (Doc. #33 at 3, ¶ 3; Doc. #34 at 3, ¶ 3); that Deron's "subjective decision-making" constituted "recruitment and hiring" violations under Title VII (Doc. #33 at 3, ¶ 4; Doc. #34 at 3, ¶ 4); and that Deron "refused to hire 'African Americans' … because of 'race.'"  (Doc. #33 at 4,

¶ 5; Doc. #34 at 4, ¶ 5).  The Supreme Court and the Sixth Circuit have made clear that such "self-serving and conclusory allegations are insufficient to withstand a motion for summary judgment."  *Evans v. Jay Instrument & Specialty Co.*, 889 F. Supp. 302, 310 (S.D. Ohio 1995) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, (1986); *Bryant v. Kentucky,* 490 F.2d 1273 (6th Cir.1974)).  Nor do the documents provided by Miller and Hall change the analysis.  In support of these allegations, they provide a copy of Deron's business card, a witness list, and a letter from Metdepenningen's aunt that merely confirms his employment at Hanwha.  (Doc. #33 at 8-13; Doc. #34 at 10-14).  But these documents do not help establish a *prima facie* case of racial discrimination as they do not in any way show pretext.[18]

In sum, Miller and Hall have presented no evidence to suggest that Hanwha and Deron did not select them as candidates for employment based on their race, rather than because their resumes indicated that they lacked numerous qualifications that Hanwha and Deron considered important – and that many other applicants possessed.  Thus, Hanwha and Deron are entitled to summary judgment.  *Macdonald-Bass*, 2010 WL 2990100, at *10 (granting summary judgment where "the evidence of record does not allow the conclusion that 'a jury could reasonably reject the employer's explanation for its decisions'").

## III.   CONCLUSION

For the reasons set forth above, **IT IS RECOMMENDED** that Defendants Hanwha and Deron's Motions for Summary Judgment **(Docs. #31, 32)** be **GRANTED**.

Dated: September 21, 2016                                s/David R. Grand
Ann Arbor, Michigan                                      DAVID R. GRAND
                                                         United States Magistrate Judge

---

[18] Miller also provides a declaration by Deron in which she avers that Chang Bum Kim was not at Hanwha in November 2015, and an article, whose source is unclear, on the opening of the Hanwha facility.  (Doc. #34 at 15-19).  Neither document bears on the issues before this Court.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 21, 2016.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager